## Makeever v. Georgia Southern and Florida Railway Company, et al.

(Decided May 6, 1927.)

Appeal from Jefferson Circuit Court
(Chancery Branch, Fourth Division).

1.   Corporations.—Mere solicitation of business by agent of foreign corporation does not constitute "doing business" in state within meaning of Civil Code of Practice, section 51, subsection 6, au-

thorizing service of process on foreign corporations engaged in business within state.

2. Railroads.—Foreign corporation maintaining agents within state for solicitation of business and for rate adjustment thereon, for which office and office force were maintained, held "doing business" in state within meaning of Civil Code of Practice, section 51, subsection 6, authorizing service of process on foreign corporations engaged in business within state.

3. Carriers.—First connecting carrier owning and operating initial carrier covering transportation of shipment of stock pigs held, as regards liability for loss resulting, equally an "initial carrier" as to such shipment.

4. Carriers.—In action for damages to stock pigs during transportation by different carriers and accompanied by no attendant, plaintiff need not state damage occurring on lines of connecting carriers or properly chargeable to each; allegation that initial carrier received animals in good condition, and that they were delivered in damaged and injured condition, being sufficient.

5. Carriers.—Ordinarily, an intermediate carrier is not liable for injuries resulting from something that did not happen on its own line; but, when two or more carriers participate in shipment and fail to allocate this damage as among themselves, they cannot complain when a joint judgment is taken against them.

THOS. C. MAPOTHER for appellant.

HUMPHREY, CRAWFORD & MIDDLETON and TRABUE, DOOLAN, HELM & HELM for appellees.

OPINION OF THE COURT BY DRURY, COMMISSIONER—Reversing.

The appellant, whom we shall refer to as the plaintiff, sought to recover a judgment for $1,800.00 against the Georgia Southern & Florida Railway Company, Southern Railway Company, Louisville & Nashville Railroad Company, and Chicago, Indianapolis & Louisville Railway, the appellees, whom we shall refer to as the carriers. He was unsuccessful, and has appealed. According to the allegations of the plaintiff's pleadings, on February 17, 1922, D. K. Young & Co. shipped to the plaintiff, Makeever, from Sparks, Ga., to Rensselaer, Ind., 145 stock pigs, which he alleges were received by the initial carrier, Georgia Southern & Florida Railway Company, at Sparks, Ga., in good condition; that no attendant accompanied the shipment; that when these pigs were delivered to him at Rensselaer, Ind., by the Chicago, Indianapolis & Louisville Railway, 6 of them were dead and that by reason of their bruised, injured, sick, depleted, and damaged condition, 127 thereafter died, leav-

ing only 12 ultimate survivors; that the Georgia Southern & Florida Railway Company issued a through bill of lading for this shipment, which bill he filed with his pleadings; that these pigs were by the initial carrier transported to Macon, Ga., where it delivered them to the first connecting carrier, Southern Railway Company, which, in turn, transported the pigs to Atlanta, where it delivered them to the second connecting carrier, Louisville & Nashville Railroad Company, which brought the pigs to Louisville, where it delivered them to the terminal carrier, Chicago, Indianapolis & Louisville Railway, which made delivery of the shipment at Rensselaer, Ind.; that all four of these carriers participated in the transportation of the pigs from the point of origin to final destination; and that the loss, damage, and injury for which recovery was sought was caused by the negligent acts and omissions of each and all of them.

The initial carrier, Georgia Southern & Florida Railway Company, filed a motion to quash the service of summons upon it, which was sustained, and the plaintiff excepted. The second connecting carrier, Louisville & Nashville Railroad Company, and the terminal carrier, Chicago, Indianapolis & Louisville Railway, filed two motions, one to require the plaintiff to elect whether he would prosecute the action for all or any part of the damages claimed against those carriers, and another to require plaintiff to make his petition more specific and certain by setting out what part of the damages sued for was due to transportation over the lines of each. Both of these motions were sustained, and again he excepted. Thereupon the plaintiff declined to elect between these carriers or to specify what part of the damage sued for occurred on the line of or was due to the act or omission of each of any particular carrier, and declined to plead further. Whereupon the court dismissed his action.

There are three questions presented, which we shall first state, and then consider in the order in which we state them:

First, did the court err in quashing the service of the summons upon the intial carrier, Georgia Southern & Florida Railway Company?

Second, were the allegations made by the plaintiff as to the control and operation of the Georgia Southern & Florida Railway Company by the first connecting carrier, Southern Railway Company, sufficient to constitute

it equally with the Georgia Southern & Florida Railway Company, an initial carrier of this shipment?

Third, were the allegations of the plaintiff's pleading relative to these carriers participating in the transportation of these pigs sufficient to hold each and all of them liable for such damages as occurred on the line of or by reason of the acts or omissions of each and all of them?

At this point, we deem it well to state that from this record it appears that there is no such organization as the "Southern Railway System." This is simply a term used to designate the various companies which are controlled by the Southern Railway Company. These various companies, eight in number, operate in concert, and are known as the Southern Railway System. They all have the same president, vice presidents, secretary, treasurer, comptroller, traffice managers, and other general officers. The initial carrier, Georgia Southern & Florida Railway Company, in support of its motion to quash the service of summons, filed affidavits to the effect that it operated no line of railroad in Kentucky and did no business in this state of a character sufficient to subject it to service of process. By subsection 6 of section 51 of the Civil Code, this service was authorized, if the Georgia Southern & Florida Railway Company was engaged in business in this state. The expressions "engaged in business," "doing business," and others similar, have often been before the courts. See cases of Green v. Chicago, B. & Q. R. Co., 205 U. S. 530, 27 S. Ct. 595, 51 L. Ed. 916; Philadelphia & R. R. Co. v. McKibbin, 243 U. S. 264, 37 S. Ct. 280, 61 L. Ed. 710; and numerous others which are cited in the case of Thurman v. Chicago, M. & St. P. R. Co., 254 Mass. 569, 151 N. E. 63, 46 L. R. A. 563. See, also what we have written in Commonwealth v. Southern R. Co., 193 Ky. 474, 237 S. W. 11; Tenn. Pub. Co. v. Walker, 205 Ky. 420, 265 S. W. 941; and Moore v. Racine Rubber Co., 194 Ky. 106, 238 S. W. 381.

It appears to be settled that the mere solicitation of busines by the agent of a foreign corporation does not constitute the doing of business in such a way as to manifest the presence of the corporation in the state, and to justify its enforced appearance in the courts thereof by summons. The plaintiff here contends the facts of this case bring it within the rule announced by

the Supreme Court in St. Louis S. W. R. Co. v. Alexander, 227 U. S. 218, 33 S. Ct. 245, 57 L. Ed. 486, Ann. Cas. 1915B, 77. In that case, service of a summons from a state court of New York on a resident director of the St. Louis Southwestern Railway Company was upheld on proof of the maintenance there of comparative minor offices of the St. Louis Southwestern Railway Company, which was shown to be part of the Cotton Belt Route. The Georgia Southern & Florida Railway Company is shown by affidavits and other proof in this case to be a part of the Southern Railway System. It seems conceded that R. L. McKellar, the foreign freight traffic manager of the Georgia Southern & Florida Railway Company at Louisville, is an important official of that company and is a proper party on whom to serve summons, if that company is doing business in Kentucky of a character sufficient to subject it to suit in this jurisdiction. In opposition to the motion to quash, the plaintiff filed the affidavits of his attorney and those of two experienced traffic managers with exhibits attached, in the shape of maps of the Southern Railway System, and pages from "The Official Guide of the Railways." Plaintiff also took the deposition of R. L. McKellar. From these it seems apparent that the Georgia Southern & Florida Railway Company is, for all practical purposes, being operated as a division of the Southern Railway. The official guide, above referred to, shows the maintenance at Louisville, Ky., by the Georgia Southern & Florida Railway Company in its own name, of two important freight traffic officials, and a general solicitor. One of these officials, Mr. McKellar, on whom the process was served, says it also maintains a division freight office there, presided over by Mr. Perry. These officials give attention to both foreign and domestic business in and around Louisville. Mr. McKellar is also foreign freight traffic manager of the Southern Railway Company, which issues his salary check, but he holds the same position with each road comprising the Southern Railway System, including the initial carrier, Georgia Southern & Florida Railway Company, over whose division officers he has and exercises authority in matters relating to import and export traffic over that line to and from all points, including points in the state of Kentucky. Mr. McKellar in his deposition was asked about his services to the various companies operated as the Southern Rail-

way System, and we find this in his deposition: "You don't overlook any opportunities to serve any of them." To which he answered, "I hope I do not." His work embraces not only solicitation, but, to use his own language, "My business is to supervise the solicitation and rate adjustment on export and import business." The term, "rate adjustment" would appear to include the establishment and alteration of rates and provision for their publication through proper channels, and this seems to us important business, whether the traffic moving to or from points in Kentucky is foreign or not.

In the Alexander case, it appears that correspondence was had with the carrier's agent in New York about the particular claim sued on there, and settlement of the claim was attempted, and it is fairly inferable from this record that such negotiations could have been conducted here, through the agents of this initial carrier, Georgia Southern & Florida Railway Company, at Louisville, had the plaintiff so desired. All the facts considered, we think they showed the doing of business in Kentucky, by the Georgia Southern & Florida Railway Company, of such a character and extent as to warrant the inference that it is manifesting its presence in Kentucky, and is subject to service of process in this jurisdiction.

The proof shows that Mr. Perry, who has an office and an office force in Louisville of about 10 or 12 persons, is engaged in the solicitation and rate adjustment on domestic business, but that Mr. McKellar is the chief officer, and that he has an office and force of about the same size in the same city, and is engaged in the solicitation and rate adjustment on foreign business. Thus it would seem that the Georgia Southern & Florida Railway Company regards itself as well established and equipped for business in Louisville, and perfectly at home to everybody except the sheriff. We regard it as sufficiently established to be subject to suit and service of process here.

Coming now to the second question presented by this case, we find that the first connecting carrier, Southern Railway Company, is alleged to have participated in transportation of these pigs from Macon to Atlanta in the state of Georgia, but the plaintiff makes the further allegation that it was also the initial carrier as operator of the Georgia Southern & Florida Railway Company.

In the original petition we find this: "Plaintiff states that the defendant Southern Railway Company then and there operated said line of railroad then owned by said defendant Georgia Southern & Florida Railway Company."

He further alleges that "The shipment involved was handled and transported by the defendant Georgia Southern & Florida Railway Company, and defendant Southern Railway Company, operating said Georgia Southern & Florida Railway Company, to Macon, Ga., and by the defendant Southern Railway Company from Macon to Atlanta, Ga." In his amended petition the plaintiff states that the shipment "originated at Sparks, Ga., on the line of the defendant, Georgia Southern & Florida Railway Company, which was then and there owned, operated, and controlled by the defendant Southern Railway Company." Since the plaintiff's petition was dismissed on the face of the papers, these averments must be taken as true, and, moreover, the Southern Railway Company, in its answer, has not denied them. Therefore, it seems to us that the Southern Railway Company is equally initial carrier with the Georgia Southern & Florida Railway Company, under the rule laid down by the Supreme Court of the United States in Davis v. Alexander, 269 U. S. 114, 46 S. Ct. 34, 70 L. Ed. 186. That was a suit on a freight claim in Oklahoma against the Director General operating the Chicago, Rock Island & Pacific. The particular injury involved occurred on the line of the Chicago, Rock Island & Gulf Railway, a Texas corporation. Service was had on the Director General as operator of the Chicago, Rock Island & Pacific. The Supreme Court of Oklahoma, In Davis v. Alexander, 93 Okl. 159, 220 P. 358, held that the Director General operated all the railroads of which the President took control as a single national system, not as separate companies or systems, and that the Director General was liable for damages for negligent operation, regardless of the relation of the different lines to one another, and that under section 206b service of process on the service agent for any railroad gave jurisdiction over the agent of the President in respect to all railroads under federal control in the operation of which the damages complained of resulted.

The Supreme Court in the case of Davis v. Donovan, 265 U. S. 257, 44 S. Ct. 513, 68 L. Ed. 1008, held that the

Director General was not suable generally as the operator of all the railroads, but only with reference to the particular transportation system or carrier out of whose operation the liability in question arose. When Davis v. Alexander reached the Supreme Court of the United States, that court held in 269 U. S. 114, 46 S. Ct. 34, 70 L. Ed. 186:

> "While the ground on which the Supreme Court of Oklahoma rested its decision was thus unsound, the judgment of affirmance was right. Where one railroad company actually controls another and operates both as a single system, the dominant company will be liable for injuries due to the negligence of the subsidiary company."

In the case of Commonwealth v. Southern R. Co., 193 Ky. 474, 237 S. W. 11, this court held that the Southern Railway Company (a Virginia corporation) was in law the operator and controller of the Southern Railway in Kentucky, and to us it appears that the line of the latter is no more controlled and operated by the former than the lines of the Georgia Southern & Florida Railway Company are controlled and operated by the Southern Railway Company. In that case we quoted from the Southern Pacific Terminal Co. v. Interstate Commerce Com., 219 U. S. 498, 31 S. Ct. 279, 55 L. Ed. 310, this:

> "It presents a case, as we have already said, of one actively managing and uniting the railroads and the terminal company into an organized system. And it is with the system that the law must deal, not with its elements. Such elements may, indeed, be regarded from some standpoints, as legal entities; may have, in a sense, separate corporate operation; but they are directed by the same paramount and combining power and made single by it, in all transactions it is treated as single."

Therefore, we conclude the petition should not have been dismissed as to the Southern Railway Company.

Coming now to the third question presented, which affects the Louisville & Nashville Railroad Company and Chicago, Indianapolis & Louisville Railway, connecting carriers between Atlanta, Ga., and the destination, plaintiff was improperly required to elect and to state the damage occurring on the lines of or properly chargeable

to each. Plaintiff alleged all that was required of him when he alleged that the initial carrier received these animals in good condition, and that they were delivered by the terminal carrier in damaged and injured condition, and that no agent of his accompanied the shipment in transit, though the petition further alleged that the loss, damage, and injury complained of was due to the negligent acts and omissions of each and all participating carriers against which judgment is asked jointly, and severally. Under the facts alleged in this case, a jury might well believe that each and all of these carriers contributed to produce the entire damage in a degree not capable of exact measurement. The plaintiff was not required to allege or prove loss or damage occurring at any particular time or place en route, or the extent thereof on an unaccompanied shipment. We can see no good reason why the plaintiff should be required to allege matters in his petition which he would not be required to prove on the trial of his case. In the case of Cincinnati, N. O. & T. P. R. Co. v. Greening, 100 S. W. 825, 30 Ky. Law Rep. 1180, two of the companies that composed the Southern Railway Company were sued for damages to a shipment of horses and mules. In that case, the two defendant companies insisted that the contract for the carriage of these animals was made with the Cincinnati, New Orleans & Texas Pacific Railway Company, and that the Southern Railway was merely the agent and conecting carrier of the former. Therefore, they argued that the action was based on the joint undertaking and liability, and hence there could be no recovery, as it was conceded the undertaking and contract was several; but this court held there that it was proper to join the two carriers in one action. It is well to note here that the shipment complained of there was made before June 29, 1906, the date of the passage of the Carmack Amendment, imposing upon the initial carrier responsibility for damage occurring upon the lines of any connecting carrier. The court was there interpreting and announcing the liability of carriers under the common law. The court in that case upheld the judgment against the Southern Railway Company, which was a connecting carrier of the Cincinnati, New Orleans & Texas Pacific, and we can see no good reason why, if one connecting carrier should be held, a dozen might not be held, if that many participated in the carriage and were before the

court charged with having damaged the shipment while in transit. In Southern Ry. Co. v. Avey, 173 Ky. 598, 191 S. W. 460, we said:

> "The proviso in the Carmack Act (U. S. Comp. St., section 8604a) which says, 'Nothing in this section shall deprive any holder of such receipt, or bill of lading, of any remedy or right of action which he has now under existing laws,' would appear to enlarge and extend the remedy existing at the time of the enactment of the measure in 1906 by giving a complete remedy against the initial carrier, while taking away none that already existed against intermediate and subsequent carriers."

Other courts have made similar holdings. See Ginsberg & Sons v. Wabash R. Co., 219 Mich. 665, 189 S. W. 1018, 28 A. L. R. 518. See, also, 4 R. C. L. 907. In the case of Wabash R. Co. v. Priddy, 179 Ind. 483, 101 N. E. 724, a carload of mules had been shipped from Shelbyville, Tenn., to Huntington, Ind., over the lines of the Nashville, Chattanooga & St. Louis Railway Company, Louisville & Nashville Railroad Company, Chicago, Indianapolis & Louisville Railway, and the Wabash Railroad Company. The suit was against the last three. The Louisville & Nashville Railroad Company was let out on the proof. Judgment was rendered against the Chicago, Indianapolis & Louisville and the Wabash, the first being an intermediate, and the latter the terminal, carrier, and citing in support of what it said a vast number of authorities, the court held this:

> "A through carriage was undertaken and negligence charged against all, and it is a familiar rule that, if negligence be charged against all, they may be sued jointly or severally, though there be no privity between them."

Returning now to Cincinnati, N. O. & T. P. R. Co. v. Greening, we find that in that case we said:

> "The burden of proof being on these carriers to exonerate themselves from the prima facie case of negligence, established by the condition of the stock when it was received and delivered, the burden also rested on them to show as between themselves which was liable in damages. If the Cincinnati, New

Orleans Railway wished to relieve itself, it should have shown that the stock was delivered in good condition to its connecting carrier; and so, if the connecting carrier desired to place the burden of the loss upon the initial carrier, it should have shown the condition of the stock when received by it. Appellee did not know and could not know which carrier was negligent. He could not put the loss upon one more than the other."

This shows, just as clearly as human language can show anything, that while the general burden was on the shipper to show damage to the shipment in transit, that he was not under any obligation to allocate this damage or, in other words, to show how much was done by one defendant and how much by another. When he shows the receipt by the initial carrier of these pigs in good condition, that no one accompanied them, and that they were delivered in bad order, he has met the burden imposed on him, and the defendants can then "pass the. buck" among themselves and determine as among themselves, by evidence, just which one or ones of them may be responsible for the injury, and if they do not meet this burden, then a joint judgment for the entire loss against all participating carriers is proper. This rule announced by this court in the Greening case, supra, was reaffirmed in Chesapeake & O. R. Co. v. Williams, 156 Ky. 114, 160 S. W. 769, 49 L. R. A. (N. S.) 347, and again in Louisville & N. R. Co. v. Schaeffer, 213 Ky. 248, 280 S. W. 974. In all three of these cases, the carriers were held jointly for the entire damage, where they failed to allocate their several liabilities, and failed to show the amount of loss or damage properly chargeable to the line of each. The Louisville & Nashville Railroad Company and the Chicago, Indianapolis & Louisville Railway have filed a joint brief in which they cite and rely upon the case of Southern R. Co. v. Avey, supra. The Avey case was reversed, but it was reversed because, although the Southern Railway Company did allocate the damage done by it, which was shown to have been $15.75, nevertheless a judgment went against the two defendants for the whole of the damage $449.55. This was clearly erroneous, for after the proof established the damage done by the Southern, the burden imposed on it had been met.

Ordinarily, an intermediate carrier is not liable for injuries resulting from something that did not happen on its own lines, but when two or more carriers participate in a shipment and fail to allocate this damage, as among themselves, they cannot complain when a joint judgment is taken against them. The carriers contend that the rule applied in the Greening, Williams, and Schaffer cases to two participating carriers does not apply where there are more than two. It is true that in each of those cases, there were only two participating carriers, but the liability of the defendants where they failed to allocate this damage results, not from what was said in those cases, but from the law and the reasoning that support what we said there. It is suggested that what was said in the William case about what the rule would be where more than two carriers are involved is only dictum, because there were only two carriers involved in that case. We feel that what was written in the Williams case correctly declares the common law, and it is now adopted as the rule, and when applied here it is no longer dictum. There is no reason why an impossible burden should be put upon the shipper. When he does not accompany the shipment, he can no more show the time, place, manner, or particular carrier by which the injury is inflicted, where there are many, than he can where there are two participating carriers. In the Greening case, the Williams Case, and the Schaeffer case, we applied the rule where there are two carriers. In the Williams case we intimated the rule should be applied where there are more than two carriers and it must be applied in this case. The burden is upon each of these carriers to allocate and avoid the damage, or else respond for all of it. The rule is thus stated in 10 C. J., p. 541:

"Intermediate and terminal carriers are each responsible for loss or damage occurring on its own line; and the fact that each acts in the transportation as the agent of the contracting carrier furnishes no legal reason why it should not be held liable. If all the damages occurred on the line of one of the connecting carriers, the whole amount is recoverable from it. Where by reason of the negligence of each carrier damages occur on each line, the carriers are jointly and severally liable for the whole

damage, and the whole damage suffered may be recovered from either.''

In addition to the authorities cited in C. J., we will cite these: Pennsylvania R. Co. v. Naive, 112 Tenn. 239, 79 S. W. 124, 64 L. R. A. 443; St. Louis, I. M. & So. R. Co. v. Home Oil & Mfg. Co., 122 Ark. 200, 183 S. W. 176; Wabash R. Co. v. Priddy, 179 Ind. 483, 101 N. E. 724. See, also, Illinois Cent. R. Co. v. Curry, 127 Ky. 643, 106 S. W. 294, 32 Ky. Law R. 513, which was a case growing out of a shipment of horses and mules made January 11, 1904, and see cases cited therein. See, also, what we said in O'Brien & Co. v. Davis, Director Gen., 216 Ky. 693, 288 S. W. 682, and Baltimore & O. S. W. R. Co. v. Wood, 130 Ky. 839, 114 S. W. 734. The common-law liability of these carriers is not affected by the liability imposed upon the initial carrier, by the Carmack Amendment (U. S. Comp. Stats., sections 8604a, 8064aa), and we practically said as much in the case of McArthur v. Payne, 201 Ky. 793, 258 S. W. 684.

The judgment is therefore reversed as to all these carriers, and the cause remanded, with directions to the trial court to overrule their motions and proceed with the case consistently with this opinion.